UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANCO BRADESCO S.A. as
successor in interest to HSBC
BANK BRASIL S.A. – BANCO
MULTIPLO, GRAND CAYMAN BRANCH

                Petitioner,

    -against-

STEADFAST INSURANCE COMPANY and
INRONSHORE SPECIALTY INSURANCE
COMPANY.,

                Respondents.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9-7-18

18 Civ. 00331 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is a motion to vacate an arbitration award (the "Award") dated Oct. 16, 2017, submitted by Petitioner Banco Bradesco S.A. ("Petitioner") as successor in interest to HSBC Bank Brasil S.A. ("HSBC Brasil"), Banco Multiplo S.A., Grand Cayman Branch.[1] (See Mem. of Law in Supp. of Pet's. Mot. to Vacate the Arb. Award, ("Mot. to Vacate"), Jan. 1, 2018, [dkt. no. 5].) The Award was published in favor of Cross-Petitioners and Respondents Steadfast Insurance Company ("Steadfast") and

_____

[1] Bradesco alleges that on July 1, 2016, during the arbitration, HSBC sold its shares to Bradesco and that subsequent to this transaction Bradesco became HSBC's successor in interest. Insurers argue that Bradesco offers the Court no evidence of its successorship to HSBC Brasil's rights as respects the Policy or Award. Insurers bring their petition to confirm the Award against their arbitration counter party, HSBC Brasil, as well as against Bradesco.

1

Ironshore Specialty Insurance Company ("Ironshore") (collectively, the "Insurers"). (Id. at 1; see Award, Decl. of William R. Bennett, III, ("Bennett Decl."), Ex. A, Jan. 12, 2018, [dkt. no. 6].) On Feb. 12, 2018, the Insurers responded with a cross-petition to confirm the Award and in opposition to the Mot. to Vacate. (See Cross-Pet. to Confirm Arbitration Award and in Opp. to Pet. to Vacate Arbitration Award, ("Cross-Pet."), Feb. 12, 2018, [dkt. no. 15]; see Mem. of Law in Supp. of Cross-Pet. to Confirm Arbitration Award and in Opp. to Pet. to Vacate Arbitration Award, ("Mem. of Law in Supp. of Cross-Pet."), Feb. 12, 2018, [dkt. no. 17].) On March 9, 2018, Petitioner filed a Mem. of Law in Further Supp. of the Mot. to Vacate and in Opp. to Respondents' Cross-Pet. (See Mem. of Law in Further Supp. of the Mot. to Vacate and in Opp. to Respondents' Cross-Pet., ("Mem. of Law in Further Supp. of Mot. to Vacate"), March 9, 2018, [dkt. no. 21].) On March 30, 2018, Insurers replied with a memorandum of law in further support of the Cross-Petition to Confirm Arbitration Award. (See Reply Mem. of Law in Further Supp. of Cross-Pet. to Confirm Arbitration Award, ("Reply Mem. of Law in Further Supp. of Cross-Pet."), March 30, 2018, [dkt. no. 23].)

Petitioner moves pursuant to Sections 10 and 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10, 12, for an order vacating the arbitration Award for "manifest disregard of

2

the law" and granting Petitioner such other relief as may be just and equitable. (See Mot. to Vacate at 7.) Insurers petition the Court pursuant to Title 9 U.S.C. §§ 9, 207, for: (a) an order confirming the Award; (b) a judgment upon the Award; (c) denial of Petitioner's motion to vacate the Award; and (d) any other such relief as the Court deems just and proper. (See Cross-Pet. at 9.) The Court finds Petitioner fails to satisfy either prong of the "manifest disregard of law" doctrine, yet alone both, as required. For the reasons stated below, the Court grants Insurers Cross-Pet. to confirm the Arbitration Award [dkt. no 15] and denies Petitioner's Mot. to Vacate [dkt. no 4].

## I. BACKGROUND

### a. The Application for Insurance and the Insurance Policy

On June 26, 2012, HSBC Brasil, through its insurance broker, contacted the Insurers seeking to purchase a Comprehensive Credit Insurance Policy (the "Policy"). (See Cross-Pet. at 3; see Mot. to Vacate at 1.) The Policy was for a Credit Agreement ("Credit Agreement") pursuant to which HSBC Brasil had agreed to extend $50 million in credit to Casablanca International Holdings Ltd. (the "Obligor"), the repayment of which was guaranteed by Schahin Engenharia S.A. (the "Guarantor"). (See id.) On August 31, 2012, Casablanca, as

3

borrower, and HSBC Brasil, as lender, entered into the Credit Agreement. (See Mot. to Vacate at 2.) As a condition precedent to the issuance of the Policy, the Insurers required that HSBC Brasil complete an application of insurance (the "Application"). (See Mem. of Law in Supp. of Cross-Pet. at 2.) At Paragraph 10 of the Application, HSBC Brasil was asked to confirm, and did confirm, that each of the following was true:

> A. Neither the Obligor nor the Guarantor has defaulted on any senior obligations, including guarantee obligations, during the last five years. . . .
>
> C. The Obligations of the Obligor, and the Guarantor have consistently been met within 90 days of their due dates, during the last five years.
>
> D. Repayment difficulties have not led to a refinancing or rescheduling of the debts of the Obligor or of the Guarantor, during the last five years.

(See Cross-Pet. at 3-4.)

On August 30, 2012, Insurers issued the Policy to HSBC Brasil which provided coverage up to a $45 million limit of liability (being 90% of HSBC Brasil's $50 million credit) in the event of the failure or refusal of Schahin, the Guarantor, to honor its payment obligations under the Credit Agreement. (See Mot. to Vacate at 3; see Cross-Pet. at 4.)

Between August 31, 2012, and February 25, 2013, Casablanca made seven Advance Requests ("Advances") under the Credit

Agreement. (See Mot. to Vacate at 3.) Petitioner honored all seven requests, totaling just over $50 million. (Id.) Under the terms of the Credit Agreement the Advances were to be repaid no later than 360 days after disbursement, so that all seven Advances would have been repaid between August 26, 2013, and February 20, 2014. (Id.) However, Casablanca requested a one year extension of its time to repay the Advances so that repayment would be between August 21, 2014, and February 18, 2015. (Id.) HSBC Brasil agreed to extend the repayment terms, and Insurers committed to similarly extend insurance coverage. (Id.)

In August 2014, when the first repayment became due under the extended period, Casablanca defaulted under the Credit Agreement. HSBC Brasil sent Casablanca a timely notice of default in November 2014. (Id.) On April 17, 2015, both Casablanca and Schahin Engenharia filed bankruptcy proceedings in Brazil. (Id.)

On May 12, 2015, upon expiration of the "waiting period" under the Policy, HSBC Brasil submitted a Notice of Claim and Proof of Loss to Insurers, together with documents supporting Petitioner's claim under the Policy. (Id. at 4; see Cross-Pet. at 5.) Pursuant to Article 6 of the Policy, the Insurers sought additional information necessary to adjust the loss, which HSBC Brasil refused to produce. (Id.) By letter dated November 17,

2015, Insurers stated that an impasse had been reached. (See Mot. to Vacate at 4.) On December 7, 2015, pursuant to the terms of the Policy, HSBC Brasil commenced arbitration proceedings against the Insurers. (See id.; see Cross-Pet. at 5.)

### b. The Arbitration

A panel of arbitrators was duly appointed (the "Panel"). (See Cross-Pet. at 5.) HSBC Brasil selected Louis P. Sheinbaum, an experienced litigator and arbitrator, as its party-appointed arbitrator. (Id.) Insurers selected Lawrence W. Pollack, a member of JAMS and former partner of a large New York law firm, as their party-appointed arbitrator. (Id.) The Arbitrators and the Parties agreed that retired Judge John S. Martin, who served as a United States District Judge for the Southern District of New York for 13 years, would act as Umpire. (Id.)

Discovery took place from June to November 2016. (See Mot. to Vacate at 4.) By the fall of 2016, a significant discovery dispute had developed. (See Cross-Pet. at 5-6.) Insurers sought information concerning what HSBC Brasil knew about the financial condition of the Obligor and Guarantor at the time of the Application. (Id. at 6.) HSBC Brasil revealed that this information was contained in "Credit Review Reports" ("CRRs"). (Id.) HSBC Brasil refused, however, to produce the CRRs without

substantially redacting them to conceal all financial information. (Id.)

Insurers moved to compel the production of the CRRs. (See Cross-Pet. at 6.) At an in person hearing before the Panel held on September 30, 2016, the following exchange took place between the Umpire, Judge Martin, and counsel for HSBC Brasil:

> **Judge Martin:** What is the reason for the redactions?
> **Mr. Bennett:** It doesn't relate to Casablanca or Schahin Engenharia. It relates to subsidiaries in the Schahin Group.
> **Judge Martin:** Why wouldn't that be relevant?
> **Mr. Bennett:** Because the underwriters didn't ensure the subsidiaries, and the credit agreement doesn't reflect the subsidiaries. Those are nonparties.
> **Judge Martin:** But it would seem to me if there were substantial questions about the subsidiaries, that may well impact the judgment as to the parent.

(See Mem. of Law in Supp. of Cross-Pet. at 5.)

Thereafter, the Panel unanimously ruled that HSBC Brasil was obligated to produce complete and unredacted copies of the CRRs as they existed in the period prior to HSBC Brasil's Application for insurance. (Id.)

Once discovery was completed, the Parties exchanged pre-hearing briefs and witness statements. (See Mot. to Vacate at 4; see Cross-Pet. at 6-7.) A Hearing was conducted in New York City over the course of four days. (See Cross-Pet. at 6-7.) From June 5 through June 7, 2017, the Panel heard opening

statements and examinations of witnesses.  (Id.)  At the

conclusion of the witness testimony, the Parties submitted post-

hearing briefs and post-hearing reply briefs.  (Id.)  Closing

arguments were presented by counsel on September 7, 2017, in New

York, New York.


### c. The Award

On October 16, 2017, the Panel unanimously issued the

Award, dismissing HSBC Brasil's claims on the basis that HSBC

Brasil had "made material misrepresentations in the policy and

in the application for the insurance" and that "the

misrepresentations rendered the policy void ab initio."  (See

Cross-Pet. at 7, Ex. A.)  Specifically, the Panel stated that at

Article four of the Policy, HSBC Brasil had made material

misstatements to Insurers including, "[a]s of the date of the

execution of this insurance policy, [HSBC Brasil] has no

knowledge of any circumstance which could give rise to or

increase the likelihood of a loss."  (See Mem. of Law in Supp.

of Cross-Pet., Ex. A. at 2.)

The Panel noted the significance of the CRRs in finding

that HSBC Brasil made material misstatements to Insurers

concerning their knowledge of the financial condition of the

Obligor and the Guarantor:

In the course of discovery in this arbitration
proceeding, Petitioner was compelled to produce a
series of documents known as CRRs which reflect
Petitioner's internal evaluation of the credit
worthiness of Schahin and its subsidiaries.  These
documents, which had not been shared previously with
Respondents, reflect that in December 2011, before
issuance of the policies, the Schahin group's credit
rating by Petitioner was downgraded 'from CRR 6.2 to
7.2 and transference to SRU.'  . . .  Another credit
review, apparently prepared in early 2012, contains
the statement 'the interest payments for Tranche A are
overdue for two months, according to the company, due
to the contractual changes proposed by Petrobras and
not yet signed by the banks.  According to the
management these interests will be paid as soon as the
assignment is regularized  but we should also consider
the possibility that in fact the company is facing
cash flow problems to repay the obligations." . . .
The same document states: "close monitoring is
required on this period of delicate cash flow
management. . . ."  These documents also reflected the
fact that payments due under the Tranche A Loan from
February to December 2012 had been rescheduled to
2013.

(See Decl. of Michael A. Knoerzer in Supp. of Cross-Pet., Ex. A,

Feb. 12, 2018, [dkt. no. 16] at 2.)

Regarding the issue of the materiality of the concealed

information, the Panel found that, "[t]he standard for

determining whether a misstatement or failure to disclose is

material was set forth by the New York Court of Appeals in Geer

v. Union Mut. Life Ins. Co., 7 N.E.2d 125, 127 (N.Y. 1937) as

follows:

where an applicant for insurance has notice that
before the insurance company will act upon the
application, it demands that specified information
shall be furnished for the purpose of enabling it to

determine whether the risk should be accepted, any
untrue representation, however innocent, which either
by affirmation of an untruth or suppression of the
truth, substantially thwarts the purpose for which the
information is demanded and induces action which the
insurance company might otherwise not have taken, is
material . . . . The question in such case is not
whether the insurance company might perhaps have
decided to issue the policy even if it had been
apprised of the truth, the question is whether failure
to state the truth where there was duty to speak
prevented the insurance company from exercising its
choice of whether to accept or reject the application
upon a disclosure of all the facts which might
reasonably affect its choice."

(See Mem. of Law in Supp. of Cross-Pet., Ex. A. at 3.)

Furthermore, the Panel stated that the sworn testimony of

Insurers' underwriters made clear that had the information

contained in the CRRs been disclosed, Insurers' "underwriting

decisions would certainly have been affected." (Id.)

The Panel, in responding to HSBC Brasil's argument that

Insurers' testimony was "self-serving and that none of the

undisclosed information would have affected the underwriting

decision" stated, "in assessing this argument, it is worthwhile

to look at what the application for insurance might have looked

like had Petitioner not checked the boxes indicating that the

statements in Section 10 A, C and D of the Application were

correct. The Application provided: 'if any of the statements in

Section 10 are not checked please explain." (Id. at 3-4.) The

Panel continued:

10

A candid explanation [by HSBC Brasil in response to Application Paragraph 10] would have said, 'in the fourth quarter of 2011, we downgraded the credit rating of the Schahin group and monitoring of all credit advances to the group was transferred to our Special Risk Unit because Deep Black Drilling LLP, a wholly-owned subsidiary of Casablanca failed for three months to make payments on the Tranche A Loan, a $300 million financing guaranteed by Engenharia. Ultimately, payments due on this loan from February 2012 on were rescheduled to 2013. According to the Company's management, the failure to make the payments resulted from a readjustment of a contract that it has with Petrobras but we also consider it possible that in fact the company is facing cash flow problems to repay the obligations.

It is hard to believe that such a statement that the bank itself had downgraded the credit rating of the borrowers and had transferred the accounts to a Special Risk Unit would not have been something that the underwriters would have taken into consideration in establishing the terms under which they would ensure a loan to [the Obligor] guaranteed by [the Guarantor]. Thus, there is no basis on which we can reasonably reject the testimony of the underwriters that the undisclosed information was material to their decision-making.

(Id. at 4.)

The Panel rejected HSBC Brasil's argument that Section 10 of the Application was ambiguous and did not apply because different Schahin affiliates were the primary debtors on the Tranche A Loan:

In its own internal reviews, Petitioner evaluated creditworthiness of the Schahin group as a whole because it recognized that the financial stability of each of the subsidiaries was interdependent. Even though only Deep Black Drilling had defaulted on its obligations, it was the overall financial condition of the Schahin group that caused Petitioner to place the

11

group on the watch list. Given its own internal
recognition that the credit worthiness of any member
of the Schahin group had to be accessed by looking at
the financial condition of each of the component
corporations, there can be little doubt that
Petitioner understood that the failure of any one
component of the group to meet its financial
obligations was something that had to be considered in
determining whether to advance funds to any other
member of the group. Moreover, Deep Black Drilling
was a wholly-owned subsidiary of Casablanca which in
turn was a subsidiary of Schahin. Given these facts,
Petitioner must have understood that the information
upon which it relied in making its credit decisions
was information that Respondents were seeking in
Section 10 of the application.

(Id.)

Additionally, the Panel rejected HSBC Brasil's argument

that the Application did not compel disclosure of the

information contained in the CRRs, finding:

Given the fact that Section 10 of the application
posed three separate questions concerning defaults by
the borrower or the guarantor, a sophisticated banker
like Petitioner should have understood that the
questions posed were designed to elicit information
relevant to the assessment of the creditworthiness of
Casablanca and Schahin and that the default by a
subsidiary of Casablanca on a loan guaranteed by
Schahin was something the insurer would want to
consider in deciding on terms of a loan to Casablanca
guaranteed by Schahin. Since the default with respect
to the Tranche A Loan were the reason Petitioner put
the Schahin group on the watch list and downgraded its
credit rating, Petitioner could not have failed to
recognize that it was obligated to disclose this
information to the insurers.

In any event, the failure to disclose the information
reflected in the CRR's constitutes a breach of
Petitioner's representation in Article 4.E of the

Policy that it was not aware of any circumstance that
could increase the risk of a Loss.

(Id. at 5.)

For the above reasons, the Panel declared the Policy
rescinded based upon HSBC Brasil's material misrepresentations.
(Id. at 8.)  The Panel ordered the Insurers to refund the "full
amounts of the premiums they received with interest at a rate of
9% per annum from the date those payments were made."  (Id.)

Pursuant to instructions received from HSBC Brasil,
Insurers delivered return premium plus interest (accruing
through the dates Insurers remitted the funds) to HSBC Brasil in
the amount of $3,501,794.24, which HSBC Brasil has accepted and
retained.  (See Mem. of Law in Supp. of Cross-Pet. at 10.)

## II.   **LEGAL STANDARD**

"Petitioner is not asserting vacatur under the FAA."  (Mot.
in Further Supp. of Mot. to Vacate at 4.)  Rather, Petitioner
argues that the Award should be vacated "because the holding
conflicts squarely with New York state law."  (Mot. to Vacate at
1.)   Specifically, Petitioner claims that "the Panel[]
disregard[ed] . . . the law of the State of New York on the
issue of what is material when underwriting an insurance risk"
and, therefore, "Petitioner seeks to vacate the Award under the
'manifest disregard of the law' standard long recognized by the

Second Circuit." (Mot. to Vacate at 9; See Mot. in Further

Supp. of Mot. to Vacate at 1.)

The Court of Appeals "has long held that "[a]n arbitration

award may be vacated if it exhibits 'a manifest disregard of the

law.'" Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004)

(quoting Goldman v. Architectural Iron Co., 306 F.3d 1214, 1216

(2d Cir. 2002)). However, the Court of Appeals has also

> been quick to add that manifest disregard of law as
> applied to review of an arbitral award is a severely
> limited doctrine. Indeed, we have recently described
> it as a doctrine of last resort-its use is limited
> only to those exceedingly rare instances where some
> egregious impropriety on the part of the arbitrators
> is apparent, but where none of the provisions of the
> FAA apply. Accordingly, we have said that the
> doctrine gives extreme deference to arbitrators.
>     An arbitral award may be vacated for manifest
> disregard of the law only if a reviewing court finds
> both that (1) the arbitrators knew of a governing
> legal principle yet refused to apply it or ignored it
> altogether, and (2) the law ignored by the arbitrators
> was well defined, explicit, and clearly applicable to
> the case. We have emphasized that an arbitral panel's
> refusal or neglect to apply a governing legal
> principle clearly means more than error or
> misunderstanding with respect to the law. A federal
> court cannot vacate an arbitral award merely because
> it is convinced that the arbitration panel made the
> wrong call on the law. On the contrary, the award
> should be enforced, despite a court's disagreement
> with it on the merits, if there is a barely colorable
> justification for the outcome reached.

Wallace, 378 F.3d at 189-90 (quotation marks and citations

omitted) (second emphasis in original).

## III. **DISCUSSION**

"A motion to vacate filed in a federal court is not an occasion for de novo review of an arbitral award." Id. at 189. Rather, "[i]t is well established that courts must grant an arbitration panel's decision great deference. A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." Id. (quoting Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003).

Here, "Petitioner seeks to vacate the Award under the 'manifest disregard of the law' standard." (See Mot. to Vacate at 9; see Mot. in Further Supp. of Mot. to Vacate at 1.) Petitioner invokes this standard to challenge the Panel's Award based on two incorrect premises: (1) pursuant to New York law, testimony of an insurers' witness cannot be the only basis to prove materiality, and therefore Insurers failed to establish materiality under New York law; and (2) the Panel relied solely upon the unsupported testimony of the underwriters, unsubstantiated by any documentation, in order to determine that the Insured's representations were material. (See Mem. of Law in Further Supp. of Mot. to Vacate at 4; see Reply Mem. of Law in Further Supp. of Cross-Pet. at 2.)

Regarding the first premise, Petitioner argues that the Panel manifestly disregarded the law of the State of New York on what is material when underwriting an insurance risk. (See Mem. of Law in Further Supp. at 1.) New York law holds that "[t]he issue of materiality is generally a question of fact for the jury" or, as in the present case, an arbitration panel. Parmar v. Hermitage Ins. Co., 21 A.D.3d 539, 540 (2d Dep't 2005); Alaz Sportswear v. Pub. Serv. Mut. Ins. Co., 195 A.D.2d 357, 358 (1st Dep't 1993) ("The materiality of a particular nondisclosed fact is generally a question of fact for the jury.").

The cases cited by Petitioner in support of the proposition that mere testimony by an underwriter is not sufficient to prove materiality under New York law are cases involving motions for summary judgment. (See Mem. of Law in Further Supp. of Mot. to Vacate at 5-6.) A party moving for summary judgment is required to prove that there are no genuine issues of material fact to be tried. United Nat'l Ins. Co. v. Program Risk Mgmt. Inc., No. 13-CV-741, 2016 WL 1275047, at *10 (N.D.N.Y. Mar. 31, 2016) (finding that "[w]hen analyzing a summary judgment motion, the court 'cannot try issues of fact, it can only determine whether there are issues to be tried.'") (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994)) (cited by Petitioner).

Consistent with obtaining rescission of an insurance policy in the context of a summary judgment motion, Petitioner's cases consider an insurer's burden of showing materiality as a matter of law, not as a matter of fact. (See Mem. of Law in Further Supp. of Mot. to Vacate at 5-6); Parmar, 21 A.D.3d at 540 (though "[t]he issue of materiality is generally a question of fact," insurer must establish materiality as a matter of law on motion for summary judgment to establish right to rescind an insurance policy). Therefore, consistent with Petitioner's cases, when an insurer seeks rescission on a summary judgment motion it cannot rely solely upon its underwriter's testimony – the underwriter's testimony must be supported by documentation in order to establish materiality as a matter of law. See, e.g., Alfie's Original Souliers, Inc., v. Phoenix Assur. Co. of N.Y., 245 A.D.2d 179, 179-80 (1st Dep't 1997) (finding that the insurer's evidence, consisting of conclusory deposition testimony and underwriting practices not in effect at the time of the application, was insufficient to establish materiality as a matter of law and a fact question remained for the jury).

Here, Petitioner's cases regarding summary judgment motions are inapposite. Where, as here, Insurers did not move for summary judgment in the arbitration, but conducted a hearing on the merits with the Panel serving as trier of fact, the Insurers were not required to prove materiality as a matter of law. See

17

*Alaz Sportswear*, 195 A.D.2d at 358.  This is why, when a party

seeks rescission by summary judgement but fails to prove

materiality other than by the unsubstantiated testimony of its

underwriter, the rescission action is not dismissed, but

referred to the trier of fact, a jury.[2]  In such a case as here,

a jury or an arbitration panel can declare that a

misrepresentation or concealment was material without it having

been proven as a matter of law.[3]  Therefore, it was entirely

appropriate for the Panel to consider underwriters' testimony –

even if unsupported by any other documentation – in order to

determine whether information concealed or misrepresented was

material, in determining whether to rescind the Policy.

Petitioner has therefore failed to satisfy the first prong

of the "manifest disregard of law" doctrine: that this is one of

"the rare instances in which the arbitrator knew of the relevant

legal principle, appreciated that this principle controlled the

outcome of the disputed issue, and nonetheless willfully flouted

---

[2] See, e.g., *Curanovic v. N.Y. Cent. Mut. Fire Ins. Co.*, 307
A.D.2d 435, 438 (3d Dep't 2003) (finding that because the
insurer had no written underwriting guidelines and presented
only conclusory affidavits, it failed in establishing
materiality as a matter of law, but finding a fact question
concerning materiality remained).
[3] If on a summary judgment motion the court concludes that
materiality was not established as a matter of law, the matter
is referred to trial for resolution of the question of fact.
See, e.g., *Alfie's Original Souliers, Inc.*, 245 A.D.2d at
179-80.

the governing law by refusing to apply it." Stolt-Nielsen S.A.
v. AnimalFeeds Int'l Corp., 548 F.3d 85, 95 (2d Cir. 2008)
(internal citations and quotation marks omitted), rev'd, Stolt-
Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 130 S.
Ct. 1758, 176 L. Ed. 2d 605 (2010).

Moreover, even if the Court found that the Panel
incorrectly interpreted New York law on the issue of what
constitutes materiality when underwriting an insurance risk,
"[a] federal court cannot vacate an arbitral award merely
because it is convinced that the arbitration panel made the
wrong call on the law." Wallace, 378 F.3d at 189. "On the
contrary, the award 'should be enforced, despite a court's
disagreement with it on the merits, if there is a barely
colorable justification for the outcome reached." Id. (quoting
Banco de Sequeros del Estado v. Mut. Marine Office, Inc., 344
F.3d 255, 260 (2d Cir. 2003)) (emphasis in original). Here, the
Panel's decision was fully justified in its finding of
materiality as a matter of fact.

Accordingly, the Court finds that the Panel did not act in
manifest disregard of New York law regarding the issue of
materiality. Therefore, there is no basis under the "manifest
disregard of law" doctrine to vacate the Award.

Additionally, regarding Petitioner's second faulty premise,
even if Insurers were required by New York law to introduce to

the Panel evidence of materiality beyond underwriters'
testimony, the Court finds this requirement satisfied.  Parties
agree that as part of the underwriting process, Insurers
presented a non-binding indication ("NBI") of their interest in
providing coverage to HSBC Brasil.  (See Ex. Q to the March 30,
2018 Reply Declaration of Michael A. Knoerzer ("Reply Decl.").
The NBI reads: "Subject to: Application."  (Id.)  Therefore, the
issuance of the Policy was expressly conditioned upon HSBC
Brasil's completion of the Application and Insurers'
satisfaction with the information contained therein.  (Id.)
Recall paragraph ten of the Application, which contains three
questions, also identified by the Panel as particularly
relevant:

> A. "Neither the Obligor nor the Guarantor has
> defaulted on any senior obligations, including
> guarantee obligations, during the last five
> years. . . ."

> C. "The obligations of the Obligor and the Guarantor
> have consistently been met within 90 days of their due
> dates, during the last five years."

> D. "Repayment difficulties have not led to a
> refinancing or rescheduling of the debts of the
> Obligor or of the Guarantor, during the last five
> years."

Underwriters for Insurers testified before the Panel that
they reviewed the Application, including the above questions,
and relied upon Petitioner's answers in issuing the Policy.
(See Reply Mem. of Law in Further Supp. of Cross-Pet. at

6)(citing Ex. O to Reply Decl., Insurers' Post-Hearing Brief, at 22.) This testimony is buttressed by the language of the Policy itself, which states expressly that the Policy was issued "in reliance upon the written statements made to the Insurer by the Insured in the application . . . ." (See Reply Mem. of Law in Further Supp. of Cross-Pet. at 6) (citing Ex. E at ZUR014053) (emphasis added). Thus, consistent with Insurers' testimony before the Panel, the plain text of the Policy reflects the Parties' agreement as to the materiality of HSBC Brasil's representations regarding the accuracy and completeness of its disclosures:

> This policy has been issued in reliance upon information supplied to the Insurers named herein by the Insured. In accepting this policy, the Insured represents to the Insurers that (a) statements made to the Insurers and information provided to the Insurers which were used by the Insurers in underwriting this policy are accurate and complete and (b) that, to the best of the Insured's knowledge all information relevant to the underwriting of this policy was provided to the Insurers.

(Id.)

Moreover, New York law is well-settled regarding the materiality of responses to insurance applications: An insurer's specific inquiry into a matter indicates that such inquiry is material to the risk and "not for the insured to pass over as trifling." See Jenkins v. John Hancock Mut. Life Ins. Co., 178 N.E. 9, 10 (N.Y. 1931).

> In effect the company states to the applicant that the answers to those questions are intended to guide the company in deciding whether to accept or reject the application. By posing the question the insurer has indicated that it wants to know the facts and that it intended and expected the applicant to speak the truth so that it may acquire information concerning them. Any misrepresentation which defeats or seriously interferes with the exercise of such a right cannot truly be said to be an immaterial one.

Geer v. Union Mut. Life Ins. Co., 7 N.E.2d 125, 127 (N.Y. 1937)

Recently, the Court of Appeals stated, "[t]his Circuit . . . will only find a manifest disregard for the law where there is no colorable justification for a panel's conclusion." Pfeffer v. Wells Fargo Advisors, LLC, 723 Fed. App'x 45, 47 (2d Cir. 2018) (summary opinion) (emphasis added). Here, there was far more than a "colorable justification" for the Panel to conclude that HSBC Brasil's concealments and misrepresentations were material. The Panel relied on more than mere underwriters' testimony in examining evidence of materiality, including: review of the plain text of the Policy and the Agreement; the CRRs; the underwriters' testimony that the answers to Question 10 of the Application were material to them; and New York law which states that when an insurer asks a question such as those in the Application seeking information about the risk, "any misrepresentation which defeats or seriously interferes with the exercise of such a right cannot truly be said to be an immaterial one." Geer, 7 N.E.2d at 127; see also Zilkha v Mut.

Life Ins. Co. of N.Y., 287 A.D.2d 713, 714 (2001) (finding "[a] misrepresentation is material if the insurer would not have issued the policy had it known the facts misrepresented").

Moreover, Court of Appeals "cases demonstrate that [they] have used the manifest disregard of law doctrine to vacate arbitral awards only in the most egregious instances of misapplication of legal principles." Wallace, 378 F.3d at 190 (2d Cir. 2004) (emphasis added). Here, Petitioner has failed to demonstrate any misapplication of legal principles by the Panel, let alone an "egregious instance[]" necessary to trigger the high-threshold application of the manifest disregard doctrine. Accordingly, for the reasons stated above, the Court denies Petitioners' Mot. to Vacate [dkt. no. 4].

Regarding Insurers' Cross-Pet. seeking an order confirming the Award, it is granted.

Because the Policy and the Award are commercial in nature and involve a party from a country other than the United States, they are subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). 9 U.S.C. § 202. Under the New York Convention, "any party to the arbitration may apply to any court having jurisdiction" for "an order confirming the award against any other party to the arbitration." 9 U.S.C. § 207. "The court shall confirm the award unless it finds one of the grounds for

refusal or deferral of recognition or enforcement of the award specified in the said Convention." (Id.) (emphasis added).

As stated in Section 207, grounds for refusal or deferral include: (1) incapacity of a party; (2) lack of notice; (3) resolution of a non-arbitral dispute; (4) improper composition of the arbitration panel; (5) an award that is not binding; (6) subject matter of the arbitration that is not capable of settlement by arbitration under the law of the country where enforcement of the award is sought; or (7) a violation of public policy arising from recognition of the award. See New York Convention Art. V § 207; Yusiif Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997).

Petitioner does not mention the New York Convention in its papers and fails to argue that any of the above grounds for refusal or deferral apply. Accordingly, the Court finds that none of the above grounds for refusal or deferral are satisfied, and, pursuant to the New York Convention, the Court must confirm the Award.

Finally, the New York Convention permits "a court in the country under whose law the Arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award." Yusuf Ahmed Alghanim & Sons, 126 F.3d at 21. Thus, where an "[a]rbitration was entered

24

in the United States. . . the domestic provisions of the FAA also apply, as is permitted by Articles V(1)(e) and V(2) of the New York Convention.  The FAA and the New York Convention work in tandem, and they have overlapping coverage to the extent that they do not conflict."  Scandinavian Reins. Co. Ltd. v. St. Paul Fire & Marine Ins. Co., 668 F.3d 60, 71 (2d Cir. 2012) (citations and internal quotation marks omitted).

Under the statutory requirements of the FAA, an arbitration award may only be vacated if it is the product of: (1) fraud or undue means; (2) evident partiality or corruption in the arbitrators; (3) arbitrator misconduct; (4) the arbitrators exceeding their powers; or (5) evident material miscalculation or mistake.  See 9 U.S.C. §§ 10(a)(1)-(4) & 11(a).

Petitioner does not "seek to vacate the award under the FAA" and fails to satisfy any of the above statutory bases for vacating an arbitration.  (See Mem. of Law in Further Supp. of Mot. to Vacate at 1.)  Accordingly, there is no basis to vacate the Award under either the FAA or the New York Convention.

## IV.  **CONCLUSION**

For the reasons stated above, the Court denies Petitioner's Mot. to Vacate [dkt. no. 4] and grants Insurers' Cross-Pet. to Confirm the Arbitration Award against both HSBC Brasil and Bradesco [dkt. no. 15].  The Court enters judgment confirming

the October 16, 2017 Award.  The Clerk of Court is directed to

enter judgment forthwith and terminate the above docket entries.


    SO ORDERED.

Dated:    New York, New York
           September 7, 2018

                              LORETTA A. PRESKA
                              Senior United States District Judge